J-A27013-17

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | |
|---|---|
| MELKIR CAPITAL, LP, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| ERIE INSURANCE EXCHANGE, | |
| Appellee | No. 302 WDA 2017 |

Appeal from the Order Entered January 24, 2017
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): No. GD 14-21669

BEFORE:  BENDER, P.J.E., SHOGAN, J., and MUSMANNO, J.

MEMORANDUM BY BENDER, P.J.E.:                FILED MARCH 7, 2018

Appellant, Melkir Capital, LP ("Melkir"), appeals from the trial court's January 24, 2017 order granting Appellee's, Erie Insurance Exchange ("Erie"), motion for summary judgment and denying Melkir's motion for summary judgment.  After careful review, we vacate the trial court's order and remand for further proceedings consistent with this memorandum.

The trial court summarized the facts alleged by Melkir in its motion for summary judgment as follows:

> [Melkir] is the owner of property located at 3336 Babcock Boulevard, Pittsburgh, PA 15237 ("the Property[]")[.]   The Property is situate[d] at the northeast corner of the intersection of Babcock Boulevard and Hillcrest Drive.  At all times in question, the Property was insured by Erie....
>
> During the effective period of the [insurance policy at issue, the Ultrapack Plus Policy (hereinafter "Policy")], Melkir [] suffered a loss in the form of a sinkhole collapse in an area adjacent to the parking lot of the Property immediately adjacent to Hillcrest Drive.

An engineering consulting firm was retained to inspect the sinkhole and to determine its cause and origins. Following his inspection, Chief Engineer Harold P. McCutcheon of KU Resources issued a report, in which he concludes that the sinkhole collapse occurred due to water moving in and around a subterranean culvert system that had displaced the soil and limestone aggregate backfill under the pavement, creating a void under the area of collapse. The water was allowed to move freely outside of the culvert system due to cracks and breaks in the metal piping which comprises the culvert system in that area. The displaced material was then flushed away through the openings in the culvert system, resulting in the formation of a sinkhole.

On August 5, 2014, Erie [] issued a denial for the sinkhole collapse on the property, prior to reviewing their own expert report. The expert report issued by Erie['s] expert[,] Joshua Hunt, PE., concurred with the findings of [Melkir's] expert, KU Resources Inc.[,] and rendered the following conclusions:

1. It appears likely that the noted significant water infiltration through the concrete masonry block of the exterior walls of the exterior stairwell is largely attributable to elevated groundwater levels resulting from the leaking of the storm water line that is located along the southern (right) edge of the property. I observed no visible evidence that would indicate that the conclusions expressed in the letter prepared by KU Resources Inc. [,] the engineer retained by Melkir…[,] were incorrect, and I recommend that this storm water line be repaired as soon as practically possible to mitigate against additional damages resulting from the enlargement of the existing sinkhole and/or the creation of additional sinkholes.

2. However, I cannot rule out that at least a portion of this water infiltration through the blockwork of the walls of the exterior stairwell is the result of surface water seeping through the gapping at the junctures of the concrete curbs at the top of the south (right) and west (rear) stairwell walls and the surrounding concrete sidewalk/pavement. In addition, I cannot rule out that at least a portion of this water infiltration is [a] result of surface water seeping through the cracking in the asphalt pavement at the juncture of

- 2 -

the asphalt pavement and the concrete pavement.  I recommend these areas be properly sealed.

3. Furthermore, I cannot rule out that at least a portion of this water infiltration through the block work of the walls of the exterior stairwell is the result of an improperly functioning underground rainwater conductor that is discharging water into the soils in this area.  I recommend that these conductors be inspected with a sewer camera and any required repairs be implemented.  I also recommend that the drain in the slab at the base of the exterior stairs be inspected with a sewer camera to ensure that it is functioning properly.

4. No significant cracking or other visible signs of structural distress were noted in the exterior walls of the stairwell at the time of my inspection.  However, if elevated groundwater levels resulting from the leaking of the storm[]water line are not corrected, it is likely that the resultant lateral hydrostatic pressures will cause the exterior walls of the stairwell to laterally displace inward.

On July 3, 2014, Melkir…, by and through counsel, submitted a claim for its losses arising from the sinkhole collapse. Correspondence was received on October 13, 2014, by which Erie … notified Melkir … it was denying the claim.

Trial Court Opinion (TCO), 4/12/2017, at 1-3 (quoting Melkir's Brief in Support of Motion for Summary Judgment, 10/31/2016, at 2-4) (internal brackets and citation omitted; emphasis in original).[1]

_____

[1] We note that Erie disputes whether a sinkhole actually exists.  See Erie's Brief at 56 (remarking that it continues to dispute whether "the collapse of earth qualifies as a sinkhole collapse") (unnecessary emphasis and capitalization omitted).  As discussed infra, in accordance with the applicable standard of review for summary judgment motions, the trial court accepted Melkir's allegations that the collapse at issue qualified as a sinkhole.  See TCO at 1-3, 5, 17; Feleccia v. Lackawanna College, 156 A.3d 1200, 1209 (Pa. Super. 2017) ("When considering a motion for summary judgment, the trial

Subsequently, Melkir filed a complaint against Erie, seeking, inter alia, a declaratory judgment that the Policy covers Melkir's losses stemming from the sinkhole event.[2] Thereafter, the parties each filed motions for summary judgment.

To support its motion for summary judgment, Erie argued, inter alia, that (1) the sinkholes and the deterioration of the culvert system are not losses to covered property; (2) loss to the exterior wall of the rear exterior stairwell is excluded by the Policy's water exclusion; (3) Melkir did not incur any covered losses caused by a collapse; and (4) the Policy's extension of coverage for building ordinance or law coverage does not cover Melkir's losses. See Erie's Brief in Support of Motion for Summary Judgment, 8/30/2016, at 17, 19, 26, 34.

Conversely, Melkir argued, inter alia, in support of its summary judgment motion that (1) the area adjacent to the parking lot where the sinkhole collapse occurred is covered property under the Policy; (2) damage has occurred to the building on the property, therefore the loss is covered under the Policy; (3) the insured purchased additional coverage for sinkhole collapses, therefore the sinkhole collapse in this case is covered under the

_____

court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party.") (citations omitted). We do the same, and therefore refer to the collapse at issue as a sinkhole.

[2] The trial court mentions that Melkir also sought damages for breach of contract and bad faith. See TCO at 3. However, those counts have been bifurcated. Id. at 3 n.1.

- 4 -

Policy; and (4) the insured purchased an extension of coverage for building ordinance or law coverage, therefore the sinkhole collapse in this case is a covered loss under the Policy. See Melkir's Brief in Support of Motion for Summary Judgment at 9, 11, 12, 15. Further, in response to Erie's motion for summary judgment, Melkir additionally contended (1) the Policy specifically includes coverage for damage to "walks" as an extension of coverage; and (2) damage that has occurred to the building on the property was concurrently caused by the sinkhole collapse, therefore the loss is covered under the Policy. See Melkir's Brief in Opposition to Motion for Summary Judgment filed by Erie, 12/9/2016, at 4, 6.

As mentioned above, on January 24, 2017, the trial court granted Erie's motion for summary judgment and denied Melkir's motion for summary judgment. In doing so, it determined, among other things, that the sinkhole located in an area adjacent to the parking lot was not covered property under the Policy, and that the Policy's additional coverage for collapse did not apply given that there had been no abrupt collapse of an insured building or part thereof. See TCO at 6-7, 8-9. Further, it recognized that Melkir had not cited any provision of the Policy to support its concurrent cause argument. Id. at 15-17.

On February 17, 2017, Melkir filed a timely notice of appeal. The trial court did not instruct Melkir to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Presently, Melkir raises the following issues for our review:

1. Do "all-risk" insurance policies provide coverage for any and all losses unless the insurance company can specifically identify and prove the applicability of a specific written policy exclusion?

2. Are "walks" or "walkways" where the incident occurred in this case covered by the all-risk policy at issue here?

3. Are "sinkholes" covered by the all-risk policy at issue here?

4. Does the "Additional Coverage" provide coverage for the sinkhole that opened under a walkway in this case?

5. Where [Melkir's] and [Erie's] experts agree that the loss occurred near but not on pavement, does the Policy provide coverage because the "paved area" exclusion does not apply?

6. Did the trial court commit an error of law when it granted summary judgment to Erie … on the basis of unsupported conjecture that repairing the loss would require interacting with a paved portion of the property?

7. Is the damage which occurred to the insured building covered by the [P]olicy?

8. Did the trial court commit an error of law by relying on non-material facts that are not in the record when it granted summary judgment to Erie … on the basis that Erie's expert could not exclude additional unnamed causes of the loss?

Melkir's Brief at 4-5.[3],[4]

_____

[3] We reorder Melkir's issues for ease of disposition.

[4] We remind Melkir that the argument section of the appellant's brief "shall be divided into as many parts as there are questions to be argued[.]"  See Pa.R.A.P. 2119(a).  The argument section of Melkir's brief "is not divided into appropriate subsections which correspond to the questions … raised on appeal."  See Forrester v. Hanson, 901 A.2d 548, 551 n.2 (Pa. Super. 2006) (citation omitted).  Specifically, Melkir raises eight issues on appeal, but divides its brief into four sections, with eight subsections therein.  Notwithstanding, "this defect does not substantially impair our ability to review the issues presented," and we will therefore address Melkir's claims. Id.

Initially, we set forth our standard of review:

[I]n reviewing the grant of summary judgment, the following principles apply. Summary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. When considering a motion for summary judgment, the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party. In so doing, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment where the right to such judgment is clear and free from all doubt. On appellate review, then, an appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. But the issue as to whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question our standard of review is de novo. This means we need not defer to the determinations made by the lower tribunals. To the extent that this Court must resolve a question of law, we shall review the grant of summary judgment in the context of the entire record.

*Feleccia*, 156 A.3d at 1209 (citations and original brackets omitted).

Moreover, we observe that:

Where an insurer relies on a policy exclusion as the basis for its denial of coverage…, the insurer has asserted an affirmative defense, and accordingly, bears the burden of proving such defense. To determine whether [the a]ppellant has met its burden of proof, we rely on well-settled principles of contract interpretation.

The task of interpreting an insurance contract is generally performed by a court rather than by a jury. The goal of that task is, of course, to ascertain the intent of the parties as manifested by the language of the written Instrument. Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language.

> Contractual language is ambiguous 'if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.' This is not a question to be resolved in a vacuum. Rather, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. We will not, however, distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity.
>
> The polestar of our inquiry, therefore, is the language of the insurance policy.

Spece v. Erie Insurance Group, 850 A.2d 679, 682 (Pa. Super. 2004) (internal brackets, quotations, citations, and formatting omitted).

We now turn to Melkir's first issue. To begin, Melkir argues that "'all-risk' insurance policies provide coverage for any and all losses unless the insurance company can specifically identify and prove the applicability of a specific written policy exclusion[.]" Melkir's Brief at 4 (citations omitted). In other words, "[w]here … an insurance company provides an 'all-risk' policy, losses are presumed to be covered unless and until the insurance company proves an exclusion applies." Id. at 15.

We see no need to delve deeply into this issue, as neither the trial court nor Erie seem to oppose this assertion. See TCO at 4 ("The policy at issue is an 'all[-]risk' policy. … The burden of proof under an 'all[-]risk' policy shifts to the insured only after the insurer has established some exclusion in the policy[.]"); Erie's Brief at 17-18 ("If an all-risks policy — one that covers all loss except that which is specifically excluded — is at issue, however, the insured need only prove that a loss occurred. Thereafter, the insurer must

prove that the loss falls within a particular exclusion.") (citations omitted).[5] Accordingly, we apply the standard set forth supra. See Spece, 850 A.2d at 682 ("Where an insurer relies on a policy exclusion as the basis for its denial of coverage…, the insurer has asserted an affirmative defense, and accordingly, bears the burden of proving such defense.").

In its second issue, Melkir contends that "[t]he loss occurred on a 'walk' which is covered through the 'Extensions of Coverage' [s]ection of the Policy." Melkir's Brief at 21 (emphasis omitted). Specifically, Melkir argues that "[a]t [s]ection I(B), labeled Property Not Covered, the Policy notes it does not cover 'underground pipes, flues, or drains,' 'land,' or 'walks.'" Id. at 22. Yet, Melkir goes on to point out that "'walks' and therefore the 'land' walks are composed of, are added back into coverage at [s]ection VIII – Extensions of Coverage at [subsection] A(3)." Id.

We examine the relevant portions of the Policy. It sets forth:

SECTION I – COVERAGES

INSURING AGREEMENT

---

[5] We acknowledge, however, that Erie also asserts that, "[a]lthough the Policy affords coverage on an all-risks basis, it does not cover all property. Rather, it unambiguously provides that it covers only that property which qualifies as 'Covered Property,' and defines that property that does and does not qualify as such." Erie's Brief at 18 (citations omitted). It is unclear to us if Melkir intended to challenge this specific proposition. To the extent that it did, we find this claim waived. See, e.g., Wirth v. Commonwealth, 95 A.3d 822, 837 (Pa. 2014) ("Where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived. It is not the obligation of an appellate court … to formulate [the] appellant's arguments for him [or her].") (citation and original brackets omitted).

We will pay for direct physical "loss" of or damage to Covered Property at the premises described in the "Declarations" caused by or resulting from any Covered Cause of Loss.

BUILDING(S) – COVERAGE 1

A. Covered Property

Building(s) means buildings described in the "Declarations" and anything permanently attached.

\* \* \*

B. Property Not Covered

Building(s) does not apply to:

\* \* \*

4. Bridges, roadways, patios, or other paved surfaces;

\* \* \*

6. The cost of excavations, grading, backfilling, or filling;

\* \* \*

8. Underground pipes, flues, or drains;

9. Land (including land on which covered property is located) or water; and

\* \* \*

SECTION VIII – EXTENSIONS OF COVERAGE

A. Extensions of Coverage

We will pay the following "losses" at your option. Payments under these Extensions are not an additional amount of insurance and will not increase the total amount of insurance available for the coverage involved.

\* \* \*

3. Fences, Walks, Unattached Outbuildings, Tennis Courts, and Inground Swimming Pools – Coverage 1. We will cover "loss" to fences, walks, unattached outbuildings, tennis courts, and inground swimming pools caused by a peril insured against on the premises described

in the "Declarations."  We will pay up to 10% of the Building(s) – Coverage 1 limit but not to exceed $25,000 for any one "loss."  If you are a tenant and no limit is shown for Building(s) – Coverage 1, we will pay up to 10% of the Business Personal Property and Personal Property of Others – Coverage 2 limit (minimum of $1,000) but not to exceed $25,000 for any one "loss".

See Policy at 1, 13 (attached as Exhibit A to Erie's Motion for Summary Judgment).

In granting Erie's motion for summary judgment and denying Melkir's motion for summary judgment, the trial court explained:

[Melkir] argues the area of the sinkhole is not excluded from coverage because [Erie's] adjuster, Michael Umpleby, agreed at deposition the sinkhole was adjacent to, rather than in, the parking lot.  [Melkir] argues the terms "parking lot" and "area adjacent to parking lot" are not listed as Property Not Covered and, therefore, the sinkhole collapse is a covered loss.  However, Joseph Urban, of J.L. Urban Construction Services, who inspected the sinkhole collapse on behalf of [Melkir], testified there was grass and asphalt in the area of the sinkhole.  He further testified there was cracking in the parking lot; the whole pipe would have to be replaced in addition to filling in the sinkhole; the pipe basin would have to be enlarged or replaced; and the asphalt would have to be cut two feet on either side of the pipe so that when the excavation was performed the rest of the asphalt would not be damaged.  Asphalt clearly qualifies as a "paved surface."  The area of the sinkhole and the work required to remediate it clearly fall within subsection 4 [of section I(B), stating that bridges, roadways, patios, or other paved surfaces are not covered property under the Policy].  Further, if the sinkhole was adjacent to the parking lot, it was excluded under subsection 9 [of section I(B), stating that land (including land on which covered property is located) or water are not covered property under the Policy].  In either instance, the plain language of the [P]olicy indicates the sinkhole is not Covered Property.  Furthermore, [Melkir] has failed

to address [Erie's] other assertions as to why the area of the sinkhole is not Covered Property.[6]

TCO at 7 (footnotes omitted).

Although Melkir raised whether the area where the sinkhole occurred could be considered a "walk" under section VIII(A)(3) in its brief in opposition to Erie's motion for summary judgment and at the summary judgment hearing, the trial court did not specifically address that issue in its opinion. See Melkir's Brief in Opposition to Motion for Summary Judgment filed by Erie at 4-6; N.T. Summary Judgment Hearing, 12/13/2016, at 20-21.[7,8]  Melkir claims that the term "walks" as used in the Policy means "a passage for walking[,]" and that "[t]he sinkhole opened under an area near the parking lot used as a walkway."  Melkir's Brief at 21, 22 (citations omitted; emphasis in original).  Moreover, it notes that "the Policy does not distinguish between paved and unpaved walks."  Melkir's Reply Brief at 5 (citations omitted).

On the contrary, Erie claims that the term walks "suggests an area that is defined in some fashion as an area for walking, such as, for example, a

_____

[6] Erie had also argued that the sinkhole was not Covered Property because it involved excavations, backfilling, filling, and underground pipes.  See Erie's Brief in Support of Motion for Summary Judgment at 28; see also section I(B)(6), (8), supra.  The trial court did not evaluate this argument.

[7] Erie also does not suggest that Melkir has waived this issue.

[8] The trial court did conclude that Melkir's loss is not covered under section IV(A)(4)(i), which applies to walks, roadways, and other paved surfaces.  See TCO at 10.  However, in reaching that conclusion, it did not articulate if — let alone why — the area where the sinkhole formed qualifies as a walk under the Policy.  Id.

sidewalk, a concrete or stone pathway, or an elevated pathway." See Erie's Brief at 43-44 (citations omitted). Erie further argues that "[d]espite Melkir['s] arguments to the contrary, pictures in this case indisputably show that the collapsed earth formed in, and at the entrance of, a parking lot on the Property[,]" and that "[t]he parking lot is not an area designated or defined in some fashion for walking, but is an area specifically designated for parking vehicles." Id. at 44, 46. It adds that "[i]f the parties intended walks to include land and other paved surfaces, there would be no need to explicitly exclude land and other paved surfaces from the definition of 'Covered Property.'" Id. at 45.

Given that an issue exists that the trial court has not addressed, we consider it appropriate to vacate the trial court's order and remand this case so that the trial court can determine in the first instance if the sinkhole formed in a walk as contemplated in section VIII(A)(3) and, if so, whether the Policy covers such a loss. See Branton v. Nicholas Meat, LLC, 159 A.3d 540, 562 n.21 (Pa. Super. 2017) (observing that the trial court did not address an issue in its opinion granting summary judgment and therefore remanding the matter so that the trial court could rule on the issue in the first instance). Despite this disposition, however, we will address Melkir's other issues in the interest of judicial economy. See East Texas Motor Freight, Diamond Division v. Lloyd, 484 A.2d 797, 800 (Pa. Super. 1984) ("Having found a new trial is necessary, we nonetheless address the remaining contentions in the interest of judicial economy and so as to give guidance to the trial court.").

In its third issue, Melkir raises whether sinkholes are covered by the all-risk policy at issue here. Melkir's Brief at 4. In particular, it states that, under section III(A)(5)(d) of the Policy, "[w]hile 'earth sinking' is excluded from coverage, sinkholes are specifically included in coverage without any qualification or limitation." Id. at 19 (emphasis in original; citation omitted). Further, it asserts that "[s]inkholes are also covered under an exception to the 'collapse' exclusion which appears at [s]ection III(B)(7)." Id. (citation omitted).

The pertinent provisions of the Policy provide as follows:

SECTION III – EXCLUSIONS

A. Coverages 1, 2, and 3

We do not cover under Building(s) – Coverage 1 ... "loss" or damages caused directly or indirectly by any of the following. Such "loss" or damage is excluded regardless of any cause or event that contributes concurrently or in any sequence to the "loss":

\* \* \*

5. Earth Movement

\* \* \*

d. Earth sinking (other than sinkhole collapse), rising, or shifting including soil conditions which cause settling, crackling or other disarrangement of foundations, or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil, and the action of water under the ground surface.

This exclusion applies regardless of whether any of the above, in Paragraphs 5.a. through 5.d., is caused by an act of nature or is otherwise caused.

\* \* \*

- 14 -

B. Coverages 1, 2, and 3

We do not cover under Building(s) — Coverage 1 ... "loss" or damage caused:

\* \* \*

7. By collapse, including any of the following conditions of property or any part of the property:

   a. An abrupt falling down or caving in;

   b. Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

   c. Any cracking, bulging, sagging, bending, leaning, settling, shrinkage, or expansion as such conditions relates to a. or b. above.

   But if collapse results in a peril insured against at the premises described in the "Declarations", we will pay for the "loss" or damage caused by the peril insured against.

   Exclusion B.7. does not apply:

   a. To the extent that coverage is provided in Section IV — Additional Coverages, A. Collapse; or

   b. To collapse caused by one or more of the following:

      1) Fire;...sinkhole collapse....

         Sinkhole collapse means "loss" caused by sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite.

         This peril does not include:

         a) The cost of filling sinkholes; or

         b) "Loss" or damage to property caused by or resulting from the sinking or collapse of land into man-made underground cavities.

\* \* \*

SECTION IV — ADDITIONAL COVERAGES

A. Collapse

The coverage provided under this Additional Coverage – Collapse applies only to an abrupt collapse as described and limited in A.1. through A.7.:

1. For the purpose of this Additional Coverage – Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

2. We will pay for direct physical "loss" or damage to covered property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Part or that contains Covered Property insured under this Coverage Part, if such collapse is caused by one or more of the following:

* * *

d. Use of defective material or methods in construction, remodeling, or renovation if the abrupt collapse occurs after the course of the construction, remodeling, or renovation is complete, but only if the collapse is caused in part by:

* * *

2) Fire;…sinkhole collapse….

Sinkhole collapse means "loss" caused by sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite.

This peril does not include:

a) The cost of filling sinkholes; or

b) "Loss" or damage to property caused by or resulting from the sinking or collapse of land into man-made underground cavities.

3) Water damage resulting from the accidental discharge or leakage of water or steam as the direct

- 16 -

result of the breaking apart or cracking of any part of plumbing, heating, air conditioning, or other equipment or appliances, but does not include damage from a sump pump, sump pump well, or any other system designed to remove subsurface water which is drained from the foundation areas[.]

See Policy at 4, 5, 6, 7, 8-9.

As discussed above, the trial court initially determined that the area where the sinkhole occurred was not covered property, and that the Policy did not cover Melkir's losses as a result. See TCO at 7, supra. It did not conduct an alternative analysis as to whether the loss would be covered under the Policy if that area were covered property.[9]

On the other hand, the trial court did determine that Melkir's building, which sustained damage, was covered property. Id. at 7-8. Nevertheless, it concluded that the Policy excludes this loss. See id. at 8. As mentioned above, in its motion for summary judgment, Erie alleged that the Policy does not cover any damage to the building because of the Policy's water exclusion under section III(A)(6)(d)(1). See, e.g., Erie's Brief in Support of Motion for Summary Judgment at 19.[10] To counter the water exclusion claimed by Erie

_____

[9] As we explained previously, if the area is covered property because it qualifies as a walk under section VIII(A)(3), the trial court would still have to determine if the Policy covers Melkir's loss.

[10] The water exclusion states, in pertinent part:

SECTION III – EXCLUSIONS

A. Coverages 1, 2, and 3

in its motion, Melkir first averred that "[i]n addition to the general, 'all-risks' coverage provided by the Policy, Melkir … also purchased certain coverage as 'additional coverage,' within which coverage for sinkhole collapses is specifically provided."  See Melkir's Brief in Support of Motion for Summary Judgment at 12; Melkir's Brief in Opposition to Motion for Summary Judgment filed by Erie at 7.  Relying on this additional coverage provided under section IV(A)(2)(d)(2), set forth supra, Melkir claimed that "a pipe within a culvert system which freely allows water to escape its enclosure is 'defective' for its intended purpose.  Therefore, such a system inarguably contains 'defective material or methods in construction.'"  Melkir's Brief in Support of Motion for Summary Judgment at 14.  The trial court disagreed, noting that the Collapse coverage under section IV(A)(2)(d)(2) only "applies if there has been an

_____

> We do not cover under Building(s) – Coverage 1 … "loss" or damages caused directly or indirectly by any of the following. Such "loss" or damage is excluded regardless of any cause or event that contributes concurrently or in any sequence to the "loss":
>
> * * *
>
> 6. Water
>
> * * *
>
> d. Water under the ground surface pressing on, flowing, or seeping through:
>
> * * *
>
> 1) Foundations, walls, floors, or paved surfaces[.]

See Policy at 4, 5.

abrupt collapse of a building or a part thereof, which did not occur here." TCO at 9.

Next, Melkir tried to convince the trial court that the water exclusion did not apply by making a concurrent causation argument. It claimed that "[a]ccording to experts, the sinkhole collapse had the direct effect of causing water to leak into the building foundation … because … the leaking of a storm[]water line resulted in a sinkhole collapse." Melkir's Brief in Opposition to Motion for Summary Judgment filed by Erie at 7 (footnote omitted). Thus, Melkir reasoned that "[t]he cause of the sinkhole collapse adjacent to the parking lot resulted in the damage to the building. Therefore, this was a proximate cause of the loss and, hence, covered under the 'all[-]risk' policy." Id. Once again, the trial court disagreed, finding that the water exclusion excludes such loss regardless of any cause contributing concurrently to the loss, and that Melkir did not cite any provisions of the Policy in support of its concurrent cause argument. See TCO at 16.

Now, on appeal, Melkir apparently attempts to overcome the water exclusion precluding coverage for the building's damage by (1) identifying an exception to the water exclusion under section III(A)(6)(e)[11]; and (2) arguing that the water exclusion does not preempt sinkhole coverage because its

_____

[11] This exception provides that the water exclusion "does not apply to water flowing or seeping from a broken water main where the break occurs on the premises described in the 'Declarations[.]'" See Policy at 4, 5.

broad lead-in language stands in conflict with sections III(A)(5)(d) and III(B)(7), thereby creating an ambiguity as to the Policy's scope of coverage. See Melkir's Brief at 20; Melkir's Reply Brief at 9-10. It appears, however, that Melkir did not raise these arguments before the trial court.[12] It is well-established that appellants are not permitted to raise new arguments on appeal. See Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); Newman Development Group of Pottstown, LLC v. Genuardi's Family Market, Inc., 98 A.3d 645, 658 n.16 (Pa. Super. 2014) ("A new argument cannot be raised in support of an issue on appeal if it was not first presented before the trial court. Thus, this argument is waived.") (citation omitted). Consequently, we find these arguments waived, and conclude that — based on the arguments properly preserved by Melkir — the Policy does not cover any loss to the building stemming from the sinkhole due to the water exclusion raised by Erie.

Likewise, in Melkir's fourth issue, it states that "[t]he 'Additional Coverages' [s]ection of the [P]olicy specifically mentions the mechanism of loss which occurred here and therefore also covers Melkir's losses." Melkir's Brief at 23 (unnecessary emphasis omitted). It explains:

> Section IV, labeled Additional Coverages, provides coverage for "defective material or methods of construction," "sinkhole collapse," and[,]

---

[12] Further, in contravention of Pa.R.A.P. 2117(c), Melkir does not identify where it preserved these arguments either. See Pa.R.A.P. 2117(c) (requiring that the statement of the case include a statement of place of raising or preservation of issues).

> water damage resulting from the accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of plumbing...[.]

> Section IV(A)(2)(d)[(2),] (3) [of the Policy]. Again, this is an apt description of the loss at issue here: a pipe broke apart, water leaked, and the land collapsed forming a sinkhole which caused damage to the building. The loss is covered.

Id. (internal citations to record omitted). Initially, it does not appear that Melkir raised its argument relating to section IV(A)(2)(d)(3) below. Notwithstanding, as addressed supra, section IV(A)(2) only provides coverage for an abrupt collapse of an insured building or part thereof, which did not occur here. Therefore, even if preserved, this argument lacks merit.

In its fifth issue, Melkir questions whether the "paved area" exclusion applies where the parties' experts agree that the loss occurred near but not on pavement. See Melkir's Brief at 4. It argues in full:

> The sinkhole opened under an area near the parking lot used as a walkway. While the parking lot itself may not be covered under the Policy, areas near the parking lot cannot be encompassed by this exclusion. Had Erie wanted to exclude areas near the parking lot it could and should have so specified. It did not. Any argument regarding coverage of the parking lot is a red herring as the [p]arties agree the parking lot was not damaged.

Id. at 21 (internal citations and footnote omitted; emphasis in original).

We find Melkir's argument confusing and off base. As Erie discerns, "[t]he Policy ... excludes more than just parking lots from the definition of 'Covered Property.' Rather, it specifically excludes 'bridges, roadways, patios, and other paved surfaces,' and thus this provision applies to more than just parking lots on its face." Erie's Brief at 19 (referring to section I(B)(4); citations and original brackets omitted).

To the extent Melkir intended to contest whether the area of the sinkhole consisted of grass or a paved surface, we agree with the trial court that this is somewhat of a distinction without a difference. As the trial court observes, even if the area of the sinkhole were grass and not asphalt or a paved surface, the Policy does not cover "[l]and (including land on which covered property is located)...." See Policy at I(B)(9); see also TCO at 7. Thus, whether grassy or paved, the area would be excluded either way. Notwithstanding, we reiterate that the trial court did not address whether the area is a walk under section VIII(A)(3) and, if so, whether a loss would be covered under the Policy.

Relatedly, in its sixth issue, Melkir avers that the trial court committed an error of law when it granted summary judgment to Erie on the basis of unsupported conjecture that repairing the loss would require interacting with a paved portion of the parking lot. See Melkir's Brief at 4. In particular, it states that the trial court "mistakenly read into the Policy an exclusion related to performing remedial work that touched on excluded portions of the property." Id. at 25 (citation omitted). Melkir insists that "nothing in the Policy permits Erie to disclaim coverage of property or perils because the remediation is expected to require interacting with a paved area." Id.

In determining that the area of the sinkhole likely constituted a paved surface and was therefore not covered property, the trial court observed that Joseph Urban — who inspected the sinkhole on behalf of Melkir — testified that, in order to remediate the sinkhole, "the asphalt would have to be cut two feet on either side of the pipe so that when the excavation was performed

the rest of the asphalt would not be damaged." See TCO at 7 (footnote omitted). As Erie persuasively acknowledges:

> Although the court did rely upon [Mr.] Urban's testimony regarding the remediation of the collapsed earth, it did so in concluding that the area of the collapsed earth consisted of asphalt, and thus a paved surface. It noted [Mr.] Urban's testimony that the area surrounding the collapsed earth was asphalt, as well as that regarding the additional remediation work to repair the damage to the asphalt. ... Contrary to Melkir['s] argument, the trial court never concluded that its losses were excluded because remediation work would affect the parking lot.

Erie's Brief at 51-52 (internal citations omitted). Accordingly, we do not determine that the trial court committed an error of law on this basis.

Seventh, Melkir contests whether the Policy covers the damage to the insured building. See Melkir's Brief at 5. It argues that the trial court erred by holding that "because the building itself did not collapse the Policy did not provide any coverage for any part of the loss." Id. at 26. Melkir declares that "the Policy includes coverage for any 'loss' caused by sinkholes as well as losses which result from 'water flowing or seeping from a broken water main where the break occurs on the premises...[,]'...or 'water damage resulting from the accidental discharge or leakage of water ... resulting from the breaking apart or cracking of any part of plumbing...[.]'" Id. (citing section III(A)(5)(d), (6)(e); section IV(A)(2)(d)(3); and section VIII(A)(3); original brackets omitted).

We believe we have already addressed these arguments. We reiterate that, in its motion for summary judgment and brief in opposition to Erie's motion for summary judgment, Melkir challenged the applicability of the

Policy's water exclusion by raising a concurrent causation argument, and pointing to additional coverage for collapse under section IV(A)(2)(d)(2) (providing coverage for loss caused by the "abrupt collapse of a building or any part of a building that is insured ... or that contains Covered Property..." if such collapse is caused by "[u]se of defective materials or methods in construction..."). It did not raise below the applicability of section III(6)(e) (stating that the water exclusion "does not apply to water flowing or seeping from a broken water main where the break occurred on the premises...") or section IV(A)(2)(d)(3) (providing coverage for loss caused by abrupt collapse of an insured building or part thereof, if such collapse is caused by "[w]ater damage resulting from the accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of plumbing..."). Therefore, we repeat that Melkir has waived those arguments. See Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").[13] Further, the trial court considered that the building had not collapsed because Melkir had argued for coverage under section IV(A)(2)(d)(2), which requires the abrupt collapse of a building or part thereof. Based on the foregoing, we conclude that the Policy does not cover the damage to Melkir's building based on the arguments it made before the trial court.

––––––––––––––––––––––––––––––––––

[13] In any event, as mentioned supra, section IV(A)(2)(d)(3) requires the abrupt collapse of an insured building or part thereof in order to apply, and such events did not occur here.

Finally, in its eighth issue, Melkir insists that the trial court "erred by granting summary judgment to Erie at least in part based on its finding that Erie's expert was unable to exclude alternative possible causes of Melkir's loss." Melkir's Brief at 27 (citation omitted). It claims that "[n]ot only is this an overly charitable reading of [Erie's expert's] report … but this is not an appropriate basis for the granting of summary judgment." Id.

Specifically, Melkir seems to complain of the following discussion by the trial court:

> At page 7 of its brief in opposition to summary judgment, [Melkir] argues as follows:
>
>> According to experts, the sinkhole collapse had the direct effect of causing water to leak into the building foundation according because of the leaking of a storm[]water line resulted in a sinkhole collapse. [sic] The sinkhole[,] which is a covered claim and had the effect of damaging the building due to water infiltration, notwithstanding the water exclusions. [sic] [W]hen there are two … or more causes of loss, the policyholder's claim is covered as long as the immediate or proximate cause of the loss is covered by the policy. The cause of the sinkhole collapse adjacent to the parking lot resulted in the damage to the building. Therefore, this was a proximate cause of the loss and, hence, covered under the "all[-]risk" policy.
>
> Record references, quotes, citations, and footnote omitted.
>
> I cannot agree. As discussed above, the sinkhole was not a covered loss under the [P]olicy. Furthermore, the experts did not agree the sinkhole collapse had the "direct effect" of causing water to leak into the building foundation. … [Erie's] expert only stated he did not find any visible evidence that [Melkir's] expert['s] conclusions[25] were incorrect. However, he listed three other possible causes of the water infiltration that could not be ruled out.

[25] The conclusions were that water from elevated groundwater levels, resulting from the leaking storm water line, infiltrated through the concrete masonry block of the exterior walls of the exterior stairwell.

[Melkir] does not cite to any provisions of the [P]olicy in support of its concurrent cause argument. Section III-EXCLUSIONS, Section A. Coverages 1, 2, and 3, provides:

> We do not cover under Building(s)-Coverage 1 … "loss" or damage caused directly or indirectly by any of the following. Such "loss" or damage is excluded regardless of any cause or event that contributes concurrently or in any sequence to the "loss"…[.]
>
> * * *
>
> The resolution of the instant motions for summary judgment [do] not hinge on issues of proximate or concurrent causation. This case involved a determination of the applicability of the exclusions relied upon by [Erie] in denying coverage and whether the loss sustained by [Melkir] fell within any of the coverages relied upon by [Melkir]. The sinkhole was not a covered loss.

TCO at 15-17 (some emphasis added; footnote omitted).

To begin, the trial court did not grant summary judgment in favor of Erie based, even in part, on its finding that Erie's expert was unable to exclude alternative possible causes of Melkir's loss. See Melkir's Brief at 27. Erie aptly describes:

> The trial court … only found that Melkir … ascribed too much to [Erie's expert's] report in arguing that [Erie's expert] agreed that the collapsed earth directly caused water to leak into the building's foundation, noting that [Erie's expert] stated only that he did not find visible evidence that [Melkir's expert's] conclusions were wrong and identified three other possible causes of loss. In the end, the trial court concluded that no provisions of the [P]olicy supported Melkir['s] argument that the collapse of the earth was the proximate cause of its loss, and that, therefore, the loss was covered. In other words, the trial court concluded that, regardless of the fact that [Erie's expert] was unable to exclude other causes of loss, coverage under the Policy did not exist.

Erie's Brief at 54 (internal citations omitted).

As Erie points out, the trial court simply observed that Melkir seemed to overstate the extent to which Erie's expert agreed with its own expert. Notwithstanding, as the trial court determined, Melkir points to no concurrent causation language in the Policy that could overcome the water exclusion raised by Erie under section III(A)(6)(d)(1).[14] Here, the Policy excludes loss or damage caused by the exclusions set forth in section III, "regardless of any cause or event that contributes concurrently or in any sequence to the 'loss....'" See Policy at 4. This Court has interpreted a nearly identical clause to mean that "if an exception, in its entirety, applies then the loss is excluded, even if other events contributed to the loss." Spece, 850 A.2d at 684. Erie explains

_____

[14] Again, this provision sets forth, in relevant part:

> SECTION III – EXCLUSIONS
> B. Coverages 1, 2, and 3
> We do not cover under Building(s) – Coverage 1..."loss" or damages caused directly or indirectly by any of the following. Such "loss" or damage is excluded regardless of any cause or event that contributes concurrently or in any sequence to the "loss":
>
> * * *
>
> 6. Water
> * * *
>
>   d. Water under the ground surface pressing on, flowing, or seeping through:
>   * * *
>
>     1) Foundations, walls, floors, or paved surfaces;

See Policy at 4, 5 (emphasis added).

that "[t]he parties agree that the water that infiltrated the exterior stairwell traveled underground until it backed up against the exterior wall of the stairwell." Erie's Brief at 30 (citations omitted). Erie maintains that "underground water that pressed on, flowed through, and/or seeped through foundations and walls caused or contributed to Melkir['s] loss to the exterior stairwell, which is sufficient to exclude the losses to the exterior stairwell [under section III(A)(6)(d)(1)] even if other covered causes of loss also contributed." Id. at 33. Therefore, even assuming that the sinkhole collapse caused water to leak into the building's foundation as Melkir alleges, Melkir has not advanced a meritorious argument as to why section III(A)(6)(d)(1) would not exclude the loss to Melkir's building.

To summarize, we vacate the trial court's order and remand for the trial court to determine if the area of the sinkhole qualifies as a walk under section VIII(A)(3). If the area qualifies as a walk under section VIII(A)(3), the trial court must determine if the Policy covers Melkir's loss. The other issues raised by Melkir do not warrant relief.

Order vacated. Case remanded for further proceedings consistent with this memorandum. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/7/2018